INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, LOCAL UNION NO. 25, A.F.L., Defendant, Appellant,

v.

W. L. MEAD, Inc., Plaintiff, Appellee (two cases).

Nos. 4950, 4995.

United States Court of Appeals
First Circuit.

March 6, 1956.

Rehearing Denied in No. 4995
March 22, 1956.

John D. O'Reilly, Jr., and Richard S. Sullivan, Boston, Mass., with whom Stephen J. D'Arcy, Jr., Boston, Mass., was on brief, for appellant.

Daniel J. Buckley, Jr., Arlington, Mass., with whom Bernard B. Gould, Boston, Mass., was on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

W. L. Mead, Inc., plaintiff-appellee herein, is an Ohio corporation engaged in the business of common carrier of general commodities in interstate commerce. Defendant-appellant is a labor organization representing employees of W. L. Mead, Inc., at the latter's Boston terminal.

On October 11, 1954, plaintiff filed in the United States District Court for the District of Massachusetts a complaint under § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185, seeking to recover damages against the defendant Union caused by a strike instituted by the Union in alleged violation of a collective bargaining agreement, and seeking, further, an injunction against the Union forbidding the continuance of said strike and the accompanying picketing.

An order was entered by the district court denying an application by the plaintiff for a temporary injunction against the strike and peaceful picketing, on the ground that the injunctive relief sought was precluded by § 4 of the Norris-LaGuardia Act, 47 Stat. 70, D.C., 125 F.Supp. 331. On appeal, we affirmed this interlocutory order. 217 F.2d 6.

Upon remand of the case, the district court on December 2, 1954, upon the basis of findings and rulings contained in an opinion simultaneously filed, D. C.,

126 F.Supp. 466, entered an order deciding that defendant Union was liable for damages for breach of contract, "the case to stand for a determination of the amount." In our No. 4950 the Union attempted to appeal from this obviously unappealable interlocutory order, and this particular appeal must necessarily be dismissed.

After further proceedings, the district court entered a "final judgment" on March 21, 1955, ordering that W. L. Mead, Inc., recover from the Union the sum of $359,000 as damages caused by the strike in breach of the collective bargaining agreement, and ordering dismissal of defendant's counterclaim for damages and for specific enforcement of the arbitration provisions of the agreement. 129 F.Supp. 313. The Union took a timely appeal from this final judgment, which is No. 4995 on our docket.

Jurisdiction of the complaint in the court below is rested upon § 301(a) of the Taft-Hartley Act, reading as follows, 61 Stat. 156:

> "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

At the threshold, appellant insists that § 301 is unconstitutional, as being beyond the power of Congress to confer jurisdiction upon the lower federal courts.

On this constitutional issue, it is obvious that the decision in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1955, 348 U.S. 437, 75 S.Ct. 489, 99 L.Ed. 510, does not constitute a controlling precedent. It is true that in the Westinghouse case the opinion of Mr. Justice Frankfurter, speaking for himself and Justices Burton and Minton, does suggest certain doubts as to the constitutionality of § 301, doubts which he found it unnecessary to resolve because he adopted a construction of § 301 permitting a conclusion that the Congress had not intended, by § 301, to confer jurisdiction upon the federal district courts to entertain the particular sort of cause of action involved in that case. It does not appear that the five other justices who participated in the Westinghouse decision had any constitutional doubts as to the validity of § 301.

In the case at bar, we cannot avoid a decision as to the constitutionality of § 301 because the conclusion is inescapable, from the terms of that section, that Congress intended to confer upon the federal district courts jurisdiction to entertain complaints by an employer against a union, for damages resulting from the breach by the union of the terms of a collective bargaining agreement, irrespective of diversity of citizenship.

█ Congress cannot confer upon the lower federal courts a jurisdiction beyond the cases to which the judicial power of the United States extends under Art. III of the Constitution. Is the present case one "in Law and Equity, arising under * * * the Laws of the United States * * *"? As we understand appellant's argument, it is that Congress has not prescribed any federal cause of action to be enforced in a suit under § 301; that the substantive law to be applied in such a case has its origin in state law; and that, absent diversity of citizenship, Congress cannot confer upon the federal courts jurisdiction to entertain such a cause of action calling for the application of state law.

█ Of course, the basic constitutionality of the National Labor Relations Act, as an exercise of the commerce power, is beyond question. N. L. R. B. v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; N. L. R. B. v. Fainblatt, 1939, 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014. "The legislative history of the Act goes far to indicate that the purpose of the statute was

to compel employers to bargain collectively with their employes to the end that employment contracts binding on both parties should be made." N. L. R. B. v. Sands Mfg. Co., 1939, 306 U.S. 332, 342, 59 S.Ct. 508, 518, 83 L.Ed. 682. If it was the basic purpose of the Act to serve the cause of industrial peace by encouraging the processes of collective bargaining and the making of collective bargaining agreements, it would certainly be incidentally within the commerce power to provide, as a matter of federal law, that such agreements, when made pursuant to the processes established by Congress, should be legally binding upon the parties, and to provide a federal forum for the enforcement of actions for damages based upon a breach of such agreements. Such a cause of action would be an action arising under a law of the United States, *viz.*, the Labor Management Relations Act, and thus would fall within the judicial power of the United States, within the meaning of Art. III of the Constitution. If it were necessary to uphold the constitutional validity of the grant of jurisdiction in § 301, we would be prepared to hold that, to the extent that Congress itself has not prescribed the rules to be applied in a § 301 case, it intended to leave to the federal courts, and ultimately to the Supreme Court of the United States, to formulate and declare the rules as a matter of federal decisional law. We find nothing in the fragmentary, and altogether ambiguous, legislative history of § 301 which would preclude such a conclusion. See United Electrical, Radio & Mach. Workers v. Oliver Corp., 8 Cir., 1953, 205 F.2d 376, 384; Shirley-Herman Co., Inc., v. International Hod Carriers Union, 2 Cir., 1950, 182 F.2d 806; Colonial Hardwood Flooring Co., Inc., v. International Union United Furniture Workers, D.C.Md.1948, 76 F.Supp. 493, affirmed on other grounds, 4 Cir., 1948, 168 F. 2d 33; Wilson & Co., Inc., v. United Packinghouse Workers, D.C.S.D.N.Y. 1949, 83 F.Supp. 162, 165; Ludlow Mfg. & Sales Co. v. Textile Workers Union, D. C.D.Del.1952, 108 F.Supp. 45; Waialua Agr. Co., Ltd. v. United Sugar Workers, D.C.Hawaii 1953, 114 F.Supp. 243; Note, "Section 301(a) of the Taft-Hartley Act: A Constitutional Problem of Federal Jurisdiction," 57 Yale L. J. 630 (1948).

■■ But we think the constitutionality of § 301 may be sustained, and should be sustained, without resting our decision on the foregoing ground. It is well established that there is some power in Congress to confer upon the federal courts what has occasionally been called a "protective jurisdiction," where resolution of the controversy which the federal courts must thereby determine requires the application of state law—either statutory or common law. We may refer, for example, to Osborn v. Bank of the United States, 1824, 9 Wheat. 737, 6 L.Ed. 204, in which Chief Justice Marshall ruled that incorporation under a congressional charter was sufficient basis to justify under Art. III a special grant of jurisdiction to federal courts to hear cases involving such a corporation. Although the application of this principle to the general "federal question" jurisdictional statute, Pacific Railroad Removal Cases, Texas & Pac. R. Co. v. Kirk, 1885, 115 U.S. 1, 58 S.Ct. 1113, 29 L.Ed. 319, has subsequently been narrowed sharply by statutory limitation, 28 U.S.C. § 1349, so far as we are aware the principle has never been repudiated with reference to the constitutional scope of the judicial power under Art. III. Cases such as Gully v. First National Bank, 1936, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70, which define the "federal question" jurisdiction of the district courts in terms of whether the plaintiff's cause of action is predicated upon federal law, are dealing with the extent of the general statutory jurisdiction and not with the constitutional scope of jurisdiction, as was the Osborn case.

For another instance of the type of "protective jurisdiction" which we have in mind, see Williams v. Austrian, 1947, 331 U.S. 642, 67 S.Ct. 1443, 91 L.Ed. 1718, in which it was held that Congress could validly provide that the trustee in a reorganization proceeding under Chap-

ter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., might maintain an action in another federal district court against directors of the debtor corporation for an accounting of corporate assets, even in the absence of diversity of citizenship or other usual grounds of federal jurisdiction. In such a case, the provision of law conferring the federal jurisdiction is itself regarded as a law of the United States under which the case arises, even though after the case gets into the federal courts the controversy has to be determined solely by reference to state law. See also 28 U.S.C. § 1442.

It may be a matter of dispute how far this power to prescribe a "protective" federal jurisdiction extends. We shall not now attempt to probe its outer limits, for we are more than satisfied that the constitutional power is at least broad enough to cover the situation now before us. Here the jurisdiction conferred by § 301(a) relates to a subject matter which Congress undoubtedly has power to regulate under Art. I of the Constitution (commerce clause). Not only that, but the Congress has actually exercised this regulatory power by the passage of comprehensive enactments, to wit, the National Labor Relations Act, as amended, and the other provisions of the Taft-Hartley Act—which enactments do, in important respects, prescribe as a matter of federal law the rules to be applied in § 301 cases. If Congress, instead of exercising its power to the full, has chosen (as well may be the fact, though it seems we do not need to decide the point in this case) to leave certain rules in § 301 litigation to be ascertained and applied in accordance with state law, that is a matter of policy clearly within the legislative competence. See the discussion by Judge Wyzanski in Textile Workers Union v. American Thread Co., D.C. Mass.1953, 113 F.Supp. 137. See also Textile Workers Union v. Arista Mills Co., 4 Cir., 1951, 193 F.2d 529, 533; Wechsler, "Federal Jurisdiction and the Revision of the Judicial Code," 13 Law & Contemp.Prob. 216, 224 (1948) ; Mishkin, "The Federal 'Question' in the District Courts," 53 Col.L.Rev. 157 (1953) ; Wollett and Wellington, "Federalism and Breach of the Labor Agreement," 7 Stanford L.Rev. 445, 475–79 (1955).

A few illustrations will suffice to show the important extent to which a federal court in a § 301 case must necessarily be bound to apply federal rules in the determination of the controversy:

If it is the present-day law in any state (which may be doubted) that a collective bargaining agreement of itself creates no legal rights or obligations in the parties thereto, such a local rule could not be used to defeat a recovery in a federal court on a complaint in a § 301 proceeding arising in such a state, based upon a breach of a collective bargaining agreement between an employer and a union. To apply the local rule in such a case would frustrate the clearly manifested policy in the National Labor Relations Act of compelling employers "to bargain collectively with their employes to the end that employment contracts binding on both parties should be made." N. L. R. B. v. Sands Mfg. Co., 1939, 306 U.S. 332, 342, 59 S.Ct. 508, 514, 83 L.Ed. 682.

■ Since the only suits on collective bargaining agreements authorized to be maintained under § 301 are suits on agreements between an employer "and a labor organization representing employees in an industry affecting commerce as defined in this Act," whether the union is such a collective bargaining representative must be determined by the federal court in accordance with the standards prescribed in the federal Act.

■ If a complaint under § 301 is predicated upon the breach of a term of a collective bargaining agreement which the Congress has forbidden to be included in such an agreement, the federal court must necessarily hold such term invalid, and deny recovery thereon, in accordance with the federal rule, whatever might be the state law as to the validity of such a term. Thus the federal court would have to apply federal law to determine whether such a term in the agreement amounted to a forbidden

closed shop agreement, or to a permissible maintenance of membership clause. See § 8(a) (3) of the National Labor Relations Act, as amended, 61 Stat. 140–41, 29 U.S.C.A. § 158(a) (3). Cf. § 14(b), 61 Stat. 151, 29 U.S.C.A. § 164(b).

■ If the continuing validity of a collective bargaining agreement which is the subject of suit under § 301 depends upon the effectiveness of a notice of termination, this must be determined by the federal court upon an application of the rules laid down in § 8(d) of the Act, as amended. 61 Stat. 142–43.

Whether as a matter of semantics we should describe as "substantive" or as "merely procedural" those provisions of law to the effect that a labor organization shall be dealt with as a separate legal entity, to which legal rights and obligations are to be attributed, nevertheless the federal courts, under § 301, are bound to give effect to the provision of § 301(b) that a labor organization "may sue or be sued as an entity", and that any "money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets." This is so, whatever might be the state rule in such matters. Likewise, the federal courts are bound to apply § 301(d), providing that the service of legal process of any court of the United States "upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization."

The foregoing instances where a federal rule is applicable are illustrative merely, and do not pretend to be exhaustive.

As above indicated, it is possible that there may remain areas not covered by federal rule, where Congress was content to leave the applicable rule to be determined from state law sources. Thus it may be that the federal courts, in a § 301 proceeding, should determine the validity of a collective bargaining agreement, or of an alleged term thereof, by reference to the general common law formulations of state law with reference to the parol evidence rule, offer and acceptance, rescission, etc. Or the federal court might perhaps have to apply a state common law rule as to the duty to mitigate damages. And there may be other such instances where the state rule is applicable. We do not have to hold that this is so in the present case. All we need to hold is that if this is so, § 301 (a) is nevertheless a constitutional enactment.

That brings us to a consideration of the terms of the collective bargaining agreement between the parties to this suit, and to the conduct of the Union which the district court has found to have been a breach of an implied covenant in such agreement.

As of September 10, 1954, there was in effect between W. L. Mead, Inc., and Local No. 25 of the Teamsters Union a detailed collective bargaining agreement expressed to continue in effect through April 11, 1955, and thereafter from year to year unless terminated by either party by the giving of a prescribed written notice. Article VIII of the contract contained elaborate provisions for arbitration. In three separate paragraphs, Art. VIII established the scope of arbitrable questions as covering the following: (1) A controversy "concerning the meaning or application or interpretation of any of the provisions of this agreement"; (2) Any "dispute, grievance or complaint * * * which the Business Representative fails to adjust"; (3) "All discharges of employees." The arbitration provision upon which the district court relied was the second paragraph above, reading in full as follows:

"Should any dispute, grievance or complaint arise during the life of this agreement which the Business Representative fails to adjust, the dispute, grievance or complaint shall be referred to the Arbitration Panel which Panel shall be the exclusive means of adjudicating all matters."

The Arbitration Panel thus referred to was defined in Art. VIII as consisting of seven members, "three of whom shall be employers who are signatory to this agreement and who shall be selected by the Employers Group of Motor Freight Carriers, Inc., and three of whom shall be Business Agents and/or Secretary-Treasurer of Local #25. The seventh member of the panel shall be an impartial chairman who shall be chosen by the Employers Group of Motor Freight Carriers, Inc., and the Business Agents of the Union. He shall attend and preside at all meetings of the arbitration panel but shall vote only in the event of a tie." This Arbitration Panel, to function under such collective bargaining agreement and similar agreements with other employers, was duly set up with Judge Coddaire as the impartial arbitrator. Under Art. VIII, it was provided that the Panel "shall hold meetings on Thursday of each week."

The collective bargaining agreement contained no express covenant by the Union against calling a strike, though such "no-strike clauses" have been in fairly widespread use in other collective bargaining agreements.

On September 8, 1954, W. L. Mead, Inc., "grounded" an employee named Smith, who was a member of the Teamsters Union, and who had been absent from work, transferring him from a truck to the loading platform on a job carrying a lower rate of pay. On September 10, 1954, Smith, accompanied by a Business Agent of the Union, appeared at the employer's place of business and protested this transfer. The parties were unable to arrive at an amicable settlement of the dispute, which was undoubtedly an arbitrable "dispute, grievance or complaint" within the meaning of the above-quoted paragraph of Art. VIII of the agreement. To the suggestion of the employer that the matter be referred to the Arbitration Panel, the district court found, a finding which we cannot say was clearly erroneous, that the Business Agent responded: "To hell with the Joint Committee." Thereupon the Business Agent immediately called the men out on strike, without resort to the arbitration procedure. Under Art. VIII, a case had to be initiated by the worker or workers involved in the grievance and would be submitted to the Arbitration Panel through the action of the Union rather than that of the employer. The strike, and accompanying picketing which soon was extended to plaintiff's other Eastern terminals, lasted for twelve weeks, resulting in a complete shutdown of the plaintiff's business.

Notwithstanding the absence of a specific no-strike clause, the district court ruled [126 F.Supp. 467], as a matter of law that the arbitration article of the agreement, providing that the machinery there set forth " 'shall be the exclusive means of adjudicating all matters' ", was unambiguous and "that its meaning was that there should be no strike as to any matter appropriate under the agreement to be arbitrated, at least while the employer was not in default as to its own observation of the arbitration requirements." We agree with this conclusion. We also agree with the district court that the parol evidence of the negotiations leading up to the signing of the agreement, so far as such evidence was credited by him, and assuming that it might properly be considered, "does not lead me to any different conclusion from the one I have already reached without it, and on the whole tends to support it."

As stated by Chief Judge Parker in United Construction Workers v. Haislip Baking Co., 4 Cir., 1955, 223 F.2d 872, 876–77, certiorari denied 1955, 350 U.S. 847, 76 S.Ct. 87:

"It is argued that a strike could not constitute a breach of a contract which did not contain a no strike clause; but we think it clear that the purpose of the contract was to require the settlement of disputes and grievances by a procedure which would not cause a disruption of business that would necessarily result from a strike and that a strike

without following such procedure was necessarily a breach."

We think such was in effect the decision in N. L. R. B. v. Sands Mfg. Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682, where a strike was deemed to be a breach of a collective bargaining agreement which did not contain an express no-strike clause, and thus was not a protected collective activity, with the consequence that action by the employer in discharging such strikers was held not to be an unfair labor practice under § 3(3) of the National Labor Relations Act. To the same effect see N. L. R. B. v. Dorsey Trailers, Inc., 5 Cir., 1950, 179 F.2d 589.

There is strong support among secondary authorities for the view that arbitration provisions in a collective bargaining agreement, of the sort here involved, should be read as implying a covenant on behalf of the union not to call a strike in derogation of the arbitration procedures. See Cox, "Some Aspects of the Labor Management Relations Act, 1947," 61 Harv.L.Rev. 274, 308–09 (1948); Daykin, "The No-Strike Clause," 11 U.Pitt.L.Rev. 13, 34 (1949); Wolk and Nix, "Work Stoppage Provisions in Union Agreements," 74 Mo.Labor Rev. 272 (1952); BNA, Coll.Barg. Negot. Serv. 15:325 (1954).

We are reenforced in the foregoing conclusion by the fact that the National Labor Relations Board, in a parallel proceeding arising out of this very case, held that W. L. Mead, Inc., was not guilty of an unfair labor practice in discharging its employees for participating in the strike called in violation of the implied covenant of the arbitration agreement. W. L. Mead, Inc., 113 N.L.R.B. No. 109 (1955). In its opinion in that case, the Board said:

"Every encouragement should be given to the making and enforcement of such clauses. But, if employees may effectively call upon the Board to protect them when they arbitrarily breach clear and binding arbitration clauses of this kind, and turn to the use of economic force for the settlement of grievances rather than to the contractual, quasi-judicial procedure, the effect will be to discourage the making of, and the adherence to, contractual arbitration procedures. To hold that a strike in furtherance of such a material breach of a clear and binding contractual arbitration clause is to be protected by this Board would be contrary to the labor policy embodied in the National Labor Relations Act as interpreted by the Courts of Appeals and the Supreme Court."

As to whether the conclusion that this strike called by the Union was a violation of an implied term in the collective bargaining agreement is a conclusion which rests upon an application of state law, or an application of federal decisional law, we really do not have to say in this case, for there seems to be a complete dearth of indication in the Massachusetts decisions as to what would be the Massachusetts law on the point; and we have no reason to suppose that the Massachusetts courts would reach any different conclusion from that which we have stated above.

Appellant also raises some points challenging the district judge's findings as to the amount of damages. Without setting forth the points in detail, we have concluded that the findings of the district judge as to the amount of accrued and anticipated losses and lost profits suffered by appellee as a result of the strike were based upon evidence tending to establish such losses with sufficient definiteness, and cannot be held to be "clearly erroneous."

In No. 4950, the appeal is dismissed. In No. 4995, the judgment of the District Court is affirmed.